This case on today's topic is the case of Joshua Assad v. Cocagne Insurance Agency, Mosquito Mutual Insurance Company, and Grinnell Mutual Reinsurance Company. And we have Mr. Thomas Lacey for the appellant. We have Mr. Craig Unrath for one of the applicants, and John Byer for the other. And both of you gentlemen have allotted your time, you've divided your time. And you may proceed when you're finished. Thank you. Good morning. This was a firewalls case that didn't have the usual beginnings. The insurance home in most of this property was destroyed. There was no cause and origin investigation. If there was, it was never made known to the insured. The insurance company paid about $350,000 on the home and had gotten to the phase of the process where the personal property was the focus of the rest of the claim. The person that was in charge from the insurance company's perspective was the agent who sold the policy to the insured, who was the sole owner of Cocagne Insurance Agency, who derived all of his income from Cocagne Insurance Agency, who was acting as an adjuster for Mosquito Mutual once the claim was obvious. So what we had some concern with immediately was what role this person in the position of insurance adjuster was actually playing and where his allegiance, if any, lied. So I have a little trouble following some of the hats people were wearing in the briefs, but is Cocagne, is he a broker? Are they an insurance company or does he broker out insurance through Mosquito and Grinnell in this instance? I think that Cocagne Insurance Agency and its only salesperson, Gerald Cocagne, were an independent agency. They didn't have just one company's products. They had the ability to sell a couple of different lines and did. The policy sold to this particular insured was a policy from Mosquito Mutual and the homeowner's policy had provisions in it that for the most part were followed. Now the instructions, as my brief identifies, the instructions to the insured came from this singular person, Gerald Cocagne, who sold the policy and then became the adjuster. So has Mr. Assad ever dealt with anyone from Mosquito Insurance Company? Jerry Cocagne individually, sole owner of Cocagne Insurance Agency. But he's not a employee of Mosquito, I take it? He is. He is? I think it's secretary and I'm not absolutely certain it's in the record, but I think he's the secretary of Mosquito Mutual. All of their offices are in the same building. It's a situation where if Mosquito Mutual has a claim to hand, I don't know about their entire history, but I know that in this case they chose their secretary, Gerald Cocagne, to act as the adjuster. And he was paid from, and I think maybe he wrote the check, but I'm not sure that that is entirely evident, but as secretary of Mosquito Mutual wrote a check to Cocagne Insurance Agency. And since he's the sole owner of Cocagne Insurance Agency, he just, I guess, automatically had the money all to himself. He's the sole owner. That being the case, the process apparently was going wonderfully. There was minor interaction regarding payment on the amount, pardon me, the amount of payment for the structure. It was resolved at $350,000. There was another approximately $20,000 paid out for personal property. And that's a rough figure. It may be give or take $1,000. And the insured and the adjuster, agent slash adjuster, but at that point apparently purely adjuster as far as the insurance company was concerned, had developed a habit. Insured would take in handwritten documents at the instruction of the person acting as adjuster. And the adjuster would pay Mr. Cocagne by check. Everything went fine until a somewhat expensive bedroom outfit became the focus of their efforts and concern. Interestingly enough, there was no disagreement between the insurance company and the insured about the values. You know, the partially destroyed bedroom outfit, I labeled it as an expensive one. It cost about $10,000. That, it was partially damaged. The property that was located in the store at Ashland Furniture was of agreeable value, and there was no dispute about that. The dispute arose when the focus became, is this going to be a payment of actual cash value or is it going to be a replacement? And that was in the policy, he had that choice? I believe he did have the choice. He could take the actual cash value at that moment and then later, within a certain amount of time, elect to replace the furniture and get the replacement value. But if he elected the replacement, he had to put up front the money for the purchase? It appears that he did. Is that the way the policy was written? It appears that that is the way the policy was written. And while that was the subject of some inquiry, and it's part of the record because the deposition of Gerald Cocaine is part of the record, Gerald Cocaine explained that, okay, if you're going to take a check, for example, we'll keep the focus on Ashland Furniture, you took a check up there and you told me, and you called me and said, hey, I just gave a check to Ashland Furniture, I'd give you the money as soon as you got back to town, before the check was even in circulation, that is, the check to Ashland Furniture for the property. There were, specifically, the actions of the insurer included him turning in to the insurance company a handwritten list of things that he had allegedly paid. And there was much focus on whether he had paid or not paid and discussions with Ashland Furniture. The insurance company representative had complete control and complete discretion at that moment when he found out from Ashland Furniture employees that they had not received any checks. So what he did, pardon me, what he didn't do was he didn't call up the insurer and say, hey, there's a discrepancy here, you want to come and talk about this and figure it out? No. He called the insurer and said, there's going to be an examination under oath. It's going to be in five days. Be here. And that's how it went. Interestingly enough... I guess the discrepancy was that it appeared that he had submitted a check in indication that the furniture had been purchased when Ashland Furniture said it had not been purchased and they had not received a check. Correct? Does that make sense? Are you summarizing it? I think that's a fair summary. And you're saying that he had the... It was incorrect or inappropriate or in violation of breach of contract for him to set this examination? For the insurance company representative to just go straight to an examination. Right. I think it's contrary to the statements that were made by Gerald Cocaine. He went as far as to say that the unfairness as an act of gesture of fairness to the insured set the examination because he wanted to give him the opportunity. I don't have the exact words here. He attempted to stand up for the insured, Assad, since Assad had been honest with him in every other way. And additional quote, that's really why we did the statement under oath, was to give him the opportunity to explain this, not to catch him in something that he had done wrong, but to give him an opportunity to explain this. Well, there were a lot of other ways available. The simple way would have been calling him on the phone, not to announce that there was going to be an examination under oath, but to say, look, something's not right here. Shall we clear this up or shall we do this another way? No options. Straight to the examination under oath and straight to the triggering mechanism from the insurance company's perspective for shutting off the flow of payment of any further claims. Was the insured flameless? No. We have suggested that there are a number of explanations here, including the fact that the guy had a lot of stuff going on, had lost his home, lost most of his property, and there is an interpretation of this that's provided in the brief that allows for this to be entirely accidental. I took the position in my brief, and I take it now, that even if it wasn't accidental, what's the remedy? That the entire thing just blows up and, oh, by the way, insured, pay us back the money that we've already paid you. And you're talking about all the money? I couldn't even figure that out. You're talking about the $350,000 that was already actually paid by? It had already been paid, and it was approximately $370,000. Okay, and they have demanded all of that back, or have they gotten it? They demanded it all back in a letter that followed up on the examination under oath, and the letter was from Gerald Cooke. Now, have they gotten it? No, they haven't. And then this suit was initiated? It was. And the only claim of misrepresentation is about this bedroom furniture. Is that right? It is. And that's cited in the brief here as to where it is that Gerald Cooke came, admitted that that's the only misrepresentation. And is it undisputed that when he found out that the check that he thought he'd paid to Ashley wasn't paid, he took a check to Ashley? He did. As soon as the insurance company representative called him up on the phone to tell him there was going to be an examination under oath and to bring it to his attention there was a problem, he got a money order the same day, took it up to Ashley Furniture, and attempted to dispose of the issue so there wouldn't be anything to discuss. And that didn't work. I think the insurance company actually paid out of the approximate I'm using $10,000 as a round figure. It's not exactly that. I think they had actually paid out $2,500 or something in that neighborhood. But the actions of the folks involved here become obvious when we see what happened to the old bedroom outfit. Tell me about that. Citations in my brief are directly from the record and mostly taken from the discovery deposition of Gerald Cocaine. Gerald Cocaine ended up with the property at his residence claiming that the insurer, when he decided to replace his bedroom outfit, at that moment he had given up his right to his bedroom outfit. Essentially he had forfeited the ownership of the bedroom outfit and that was the end of the line. So Asad ends up, can't even get his partially damaged furniture back and is out of luck on any further items of personal property. So this all came to a halt. Everything stopped after this happened. Yes. And this suit ensued and has there been a counterclaim? Well, there was an affirmative defense. I don't believe there was a counterclaim. But essentially they tried to avoid any further responsibility on the contract. The letter that followed the examination under oath says we want our money back. But that did not show up in any counterclaim for return of the money. When you say the money back, are you talking about just the bedroom money? All the money, $370,000? Well, my recollection is in the letter from Gerald Cocaine they said they wanted all the money back that had been paid on this claim. We haven't seen the letter yet. I can probably tell you exactly what page of the record it is. Okay. Give me just a second. I may have to provide that in a rebuttal because I don't want to waste a bunch of time looking at it. But I will have that. So the long and short of it is the decision was made by the insurance company when there was an obvious discrepancy as to whether or not this agreed-of-equal-value property had been paid for or not paid for, in part or in whole. And I understand that the fact that he ran up there and paid for it as soon as the discrepancy was disclosed doesn't answer all the questions, but it somewhat answers the question as to whether the insured was attempting to be forthright about this furniture. He wanted the furniture. The Cocaine Insurance Agency decided it was fine, it was a fair replacement. The only issue is whether or not, in the process, there should have been payment made for an actual cash value or a replacement. And the claim is that the insured lied about it and provided false documents about having previously paid for it in part. And the way it ends up, the insured doesn't have his old partially damaged property, doesn't get the actual cash value for the property, essentially gets nothing and goes home. So, there are plenty of things factually of great interest. Fairness has to be an issue somewhere. I have to admit I didn't find a case, maybe my research was defective, I did not find a case that just went straight to the heart of the thing to say, look, everybody's got to be fair here. You can't just have one mistake by the insured this far into a claim and then all of a sudden everything blow up and sorry, you've got to give everything back that we've already paid you. I didn't find a case that said that. If I would have, I would have cited it in my brief. And realistically, I'm here because I can't, while I can't find a case that I can parade around here and say, okay, I win, my gut tells me that this can't possibly be how it is contemplated, that an insurance company with its exclusive knowledge in a setting where they're dealing with some guy off the street wanting insurance, they've got an agent, they've got the company, they've got a 50 or so page policy when you add up all the endorsements, everything else, and it somewhat ends that way. The insurance company and its lawyer are in some examination in a row and here is the same guy who doesn't have a clue about the workings of or the technical mechanics of insurance policy is in there and he's being scoured for having allegedly misrepresenting, having paid for something in a replacement of furniture. The bedroom set wasn't the finale of the personal property maintainer. No, there was approximately another 100,000. Another 100,000. And that probably would be disputed because there were a lot of antiques that were somewhat unique. There were other appraisals that related to the remaining personal property. The contract language, I know that there are, I cited the Barth case because it seems like that had been carrying a fair amount of load in some of the legal references and tried to identify in my brief that there are some differences in language. There is no voiding of the policy in the language of the mosquito mutual policy. That was in the state farm policy in the Barth case, not the same language. And, pardon me, not the same language appears in the mosquito mutual case. So I believe that even the language of the policy doesn't support this sort of ending. And the part about the singular person with authority that the insured was dealing with, that person ending up controlling how everything went and being able to attach all kinds of sinister motives instead of just saying, hey, look, what's the deal? Have you paid for it or have you not paid for it? If you haven't, then all we owe you is the actual cash. Unless there are questions, that's all I have. We'll have the opportunity for rebuttal. Okay, thank you. I will find out. That's okay. Mr. Unruh? No. Mr. Byer? Yes. Good morning. I'm John Byer, and I'm representing the Mosquito Mutual Insurance Company. May it please the Court, counsel. Based upon the argument of Mr. Lacey, I think I need to start off by pointing out what this case is about and what it is not about. Mr. Lacey is talking about a letter that he said was sent to his client after the exam under oath demanding back money. If that letter is in the record, I don't know where it is. It's possible that it was a part of the deposition of Gerald Cocaine. I don't recall that. What I do know is that it was never an issue in the case. It is not part of the issue before this Court. The insurance company denied the balance of the claim after finding the intentional misrepresentation. Mr. Assad then sued for the balance of his claim. The insurance company set forth an affirmative defense of misrepresentation. The trial court entered summary judgment on the affirmative defense. There was no issue regarding whether or not the insurance company is entitled to get money back. There may have been a demand. It may be in the record. I don't think so. What is the balance of the claim? Is there a number? No, because the insurer claims it will be $100,000, but he had not submitted such a claim to the company where there's something in the record that specifically says $100,000. And so what does, if you could summarize what your policy allows when there is a misrepresentation? Absolutely. If there is an intentional material misrepresentation, the company may deny coverage. As I pointed out, the previous policy language, which is in the policy booklet, the Grinnell booklet, that was a part of this policy, but then it was superseded by the endorsement. The endorsement is what the affirmative defense is based on. But the original language would say the entire policy is void if there's misrepresentation. A policy like this, a homeowner's policy, has both property insurance coverage and liability insurance coverage. Therefore, if you had a situation where someone had intentionally misrepresented something on a property insurance claim, that would void the entire policy under the old language. And similarly, if they made the misrepresentation on liability, it would void the whole entire policy, including property. This was separated so that now each, the liability section and the property section, has its own version which says coverage may be denied. In this case, we're dealing with property insurance coverage, and that's the coverage that would be denied. So you're saying you can't go back? And void the entire policy, including liability. Okay. Yes. That's correct. So you can't get the $350,000? Well, the $350,000 is under the property insurance coverage. Okay. But that is an entirely separate issue. Whether we can go back and recover that would depend upon many things, including whether or not it would have been a mandatory counterclaim. There was no counterclaim. Whether or not you can do it in a two-step process. And there is some justification for that thought, because although I'm going far afield from this case, your question prompts me to say that insurance companies who pay a property insurance claim have a right to subrogate and can sue the person responsible. Well, there are instances where insurance companies pay a mortgagee under a standard mortgage clause in a policy, which says that the rights of the mortgagee will not be void by any action taken by the insurer. In a case of intentional burning, for example, the insurance company may have to pay the claim of the mortgagee, even if they know their insurance had filed. If they want to subrogate against the insurer, it's not enough to just say, well, we've taken an assignment of the mortgage. The case law suggests they have to actually prove that their named insurer violated the policy and it was void as him, and then they can subrogate against him. That does suggest a two-part process. So whether no case has yet dealt exactly with that issue, and it's not before this court. I understand. We're just trying to get a big picture to better understand this. Okay. Now, something else that this case is not about is just a mistake, as counsel has suggested, that this is just a mistake regarding a check. But it is about whether or not there is any issue of material fact left. That is absolutely correct. It is about whether there is any issue of material fact. That's correct. But in this case, what we have to remember is that the record shows that Mr. Asai, a businessman in his own right, learns from Mr. Cocaine that the policy provides that he can either first make a claim for the depreciated value of the personal property, actual cash value, as we know, and then come back and make a supplemental claim if he replaces any property, or he can just make the replacement claim right up front by going and actually replacing the items. Now, he chose to replace some items, and then he was going to lump together anything left over and negotiate the actual cash value. That's his own testimony, which is in the record. When he went to Ashley Furniture, he talked to Diane Terrell, and her deposition shows that he came in and he was pricing furniture, and he looked at some furniture and said, that's like what I have. And he asked for a price quote. He needed something to take to the insurance company. She gave him a document, which was a price quote. It said nothing about payment. It said nothing about delivery. It said nothing about an order being placed. It was just a price quote. He then came back a few days later and asked for the same thing for the mattress and mattress pad, which she then gave him. Now, what did he turn in to the insurance company? Not those documents in their original form. Exhibits 1 through 4, which were originally marked that the examination unrolled, then later became exhibits attached to the affirmative defenses, and they are attached to my paper. Exhibits 1 through 4 are essentially two versions of the one price quote for the bedroom set and two versions of the price quote for the mattress and mattress pad. The difference between the versions is that checks are copied onto one of those documents in each case. Now, what is it that he said to the insurance company by giving them these documents? Well, if you look at those exhibits, you find that they do not just have a price quote, not at all. On those documents, it is written that the furniture was ordered, that there's a delivery date, that a down payment was made, and it even ties it to a check number. In one instance, the words paid cash appear. In another instance, the balance on the bottom of the form is circled with the word paid and a check number. Now, how did those get there if Ashley Furniture didn't put them there? The answer is simply this. The insured himself altered the documents. Those are questions of fact. We're here on a summary judgment. Aren't those questions of fact? They're not questions of fact once the insured has admitted that he made those alterations, and he did. So the admission is when he was under oath without an attorney in the insurance office? Yes. The admissions by the insured plaintiff, Mr. Assad, are during the examination under oath. That's the only evidence? No. We have the deposition of his secretary, Sasha Gutierrez, who says that she wrote much of that information on there at the direction of Mr. Assad. But there's also been a representation that perhaps that he was led to believe that he would receive the check immediately upon purchasing, and if he were to write a check, he would then receive from the insurance company a check for the same amount, I take it, on the very same day. Your Honor, what you're referring to is the deposition of Mr. Cocaine when he was questioned about, well, what if my client, Mr. Assad, had in fact given a check to the insurance company and brought in a document and said, here's the check. I misspoke. Let's say that he said the check was given to the furniture company, and here's a copy of the check. Would Mr. Cocaine on behalf of Mosquito Mutual have paid based on that representation? Answer yes. Well, you would do that even before the check had cleared. Well, yes, I would trust that. That's essentially what you're speaking of. But that isn't the case here. Diane Terrell said no check was ever given to her. Sasha Gutierrez says she never mailed a check. There was no check. Unfortunately, it appears that my time is up, but I believe that this record shows that the statements of the insurer at the exam under oath, and even without that exam under oath, the statements of Sasha Gutierrez and Ashley Furniture show that these are altered, fraudulent documents intentionally submitted to collect replacement cost coverage, and thus they were material. Thank you. Thank you, Mr. Byer. Mr. Gerling? Good morning, Your Honors. Good morning. My name is Craig Unrath, and I represent Cocaine Insurance Agency. Normally, just a standard introduction. In this case, it's actually relevant to the issues here. Gerald Cocaine is not a party to this suit. Cocaine Insurance Agency is a party, and the question that naturally arises is what has this agency done wrong? Did they sell the wrong policy? Did they have insufficient coverage? Did they fail to submit an application? There's nothing there, nothing at all. All of the claims are directed at Gerald Cocaine as an agent of Mosquito Mutual Insurance Company. There's nothing that Cocaine Insurance Agency did wrong here. Now, I don't want to make it seem like I'm throwing Mosquito Mutual under the bus here. I do think that there are some facts that are clearly undisputed, that cannot be reasonably disputed, and one is that Mr. Assad came to Gerald Cocaine in his role as agent for Mosquito Mutual, gave him receipts, and said, I paid money. I purchased these goods, and I would like to get benefits under the policy, and those benefits were paid not by checks issued by Cocaine Insurance, but by Mosquito Mutual. Mr. Assad admitted in his examination under oath that he understood that Gerald Cocaine was working as an agent of Mosquito Mutual, in a role as a claims adjuster. Now, Clayton contends that summary judgment should not be granted in favor of Cocaine Insurance Agency because Gerald Cocaine was duplicitous, that he never told Mr. Assad that he had switched hats. Now, at the outset, we dispute that entirely. As a matter of fact, Mr. Assad admitted that he understood all along that Gerald Cocaine was acting as Mosquito Mutual's agent. But let's assume it's true. Let's just hypothetically that Gerald Cocaine never let on that he was actually working for Mosquito Mutual. Now, what kind of claim does that bring forth? Is Clayton claiming that Gerald Cocaine should have had a fiduciary duty to assist him in hiding his fraudulent conduct? Is that the claim here? So that Gerald Cocaine should have found a way to conceal what Mr. Assad had done. And what he had done is clearly wrong, clearly fraudulent under the policy. Mr. Assad admitted that Gerald Cocaine explained to him that if you want replacement coverage value, benefits under the policy, you must actually replace the property. And it even went further than that. It said, we'll give you actual cash value right now, depreciated value. You can always come back later and show us the receipt saying you've actually bought this material, this property, and we'll make up the difference. Mr. Assad jumped the gun. He handed them receipts, Mosquito receipts, that said that he had actually bought the property, paid in full, paid cash, canceled check. And it's not in small amounts. We're talking thousands of dollars here. This was, under these circumstances, Mosquito Mutual was certainly correct in denying coverage on those claims. Now, it's important to understand, though, that Mr. Assad understood the process here. He understood what the rules were. Gerald Cocaine did not give him these instructions. As claims adjuster, he did not give these instructions in order to lay a trap. He gave those instructions to Mr. Assad. He told him you must actually replace the property because he's trying to ensure that Mr. Assad obtained benefits under the policy. He's trying to ensure that Mr. Assad does not want a follow-up of the policy, that he does not violate the policy. In every sense of the word, Gerald Cocaine, acting as agent for Mosquito Mutual, was assisting and helping Mr. Assad adjust his claim under the policy. There is nothing here, no evidence whatsoever, that Gerald Cocaine acted adversely to Mr. Assad in any way. And so one day, he looked at a check for $5,700-odd from Ashley Furniture, and he said it just didn't look right. He called up Ashley Furniture, and he said, we never got that check. He said, well, does an order have been placed for this furniture? He said, we have no order here. At that point, yes, the relationship did change. At that point, Gerald Cocaine had a duty to investigate. As an agent of Mosquito Mutual, he had a duty to investigate this. He had a duty to find out what had happened. Now, Counsel earlier said, he said, well, he scheduled an examination under oath. There are other ways he could have resolved this. He could have picked up the phone. How does that change anything? If he'd called and said, what happened here? What could he have done? Could he have said, listen, you're in trouble here. We need to make sure that you don't tell Mosquito Mutual what you've done. What kind of position is he in? How can he? What it comes down to is this. Even if we assume that there is some truth to this matter, that Gerald Cocaine switched hats from one position, from advocate on one hand to now claims adjuster on the other, what difference does that make? In the end, misrepresentations were made. Money was paid on the basis of those misrepresentations. It doesn't matter what hat you're wearing. The result's going to be the same. That's all I have. If there are no questions for the Court, thank you. Thank you. Mr. Lacey, do you have your bottle? It's from Mosquito Mutual Insurance Company. It's dated February 19, 2008. And it's a two-page letter. Is it in the record? It is. And it's 498 and 499. The exact quote is essentially the middle of the page on 499. One of the issues that I suppose is troublesome to me in any setting is an unequal amount of traction. And here we have discretionary behavior on the part of an adjuster, agent, whatever he is. He is numerous things all at one time. We have an examination under oath, which I've addressed in the brief, relating to statements made by Mr. Byer as to the right of an attorney and then essentially trying to scoot past that so he didn't have to honor that statement. And regardless of what anyone else may have done and who they are, the only focus that we have here, according to the insurance company, is this insurer lied to us. The only thing that counts doesn't make any difference what the attorney for the insurance company did, what an agent, adjuster, whatever you want to call him, did. The only thing that counts is this insurer lied. Well, it can be characterized in a lot of different ways. That characterization should be the province of the jury. And to sort this out in a fair way, there should be, this should be measured by folks who don't have a vested interest. And that could only be a jury. The judge measured it. I don't know what all he actually saw or didn't see. There isn't any reference in his documentary ruling that he even saw the response that was provided by the plaintiff, the response to the motion for summary judgment, and the affidavit of Josh Assad that's in there. There's no acknowledgment of it. And, in fact, I had to supplement the record on appeal because it didn't even show up on the record on appeal the first time through. So I'm not exactly sure what the judge saw or didn't see. It seems somewhat obvious. Was there a hearing? There was a hearing. Okay. And that was presented to the judge at the hearing? No. I think the date of the filing was in January. I'm thinking it's January 28, 2010 filing response. And I believe the hearing would have been in March or April. The decision would have been in June. And I'm feeling around there. I'm not exactly sure, but the response, the plaintiff's response to the motions for summary judgment was not filed the day of court. It was filed several months before the actual argument on the motions for summary judgment. You agree that the only way that the insured could get money from the insurance company is if he had actually paid to replace something, correct? The only other way would have been for him to just say, look, let me have the actual cash value now, and I'll replace it later and get the additional amount. The difference between the actual cash value and the replacement. So were there other items that he had already replaced, paid for, and then got reimbursed? Is this the only item that he had not actually paid for? Well, according, yes. According to the Gerald Cocaine statement, yes. There had been about $20,000 worth of items that had been paid by Cocaine. For replacement. For replacement. So he knew the process. Your client knew the process. The process as he knew it was to give a handwritten list of things that he paid for and the amounts that he paid. As far as the characterization that, hey, he's a businessman, so he knows all these things, I think that's an obvious attempt to suggest something that's not on the record as to what his actual businesses were, because his businesses were not sophisticated businesses. He's not a person who's on equal footing with any insurance employee of any type, agent, adjuster, attorney. This is not an equal footing settlement. I think that's about all I have. Thank you. Thank you. All parties, if you'd like to say your arguments, we'll take them in.